P. S. NOLEN *v.* THE STATE.

1. PRACTICE — LEADING QUESTIONS. — There are exceptions to the general rule which prohibits leading questions to a witness on his direct examination, but no exception warrants a direct inquiry of a party's own witness whether he had not, at a former trial, made a particular statement, — the object of the inquiry being to get the former statement before the jury, and not to attack the testimony of a witness who had stated facts injurious to the party who introduced him, as provided for in art. 755, Code of Criminal Procedure.

2. ADMISSIONS IN ARREST. — In a trial for murder, the State was allowed, over objection by the defence, to put in evidence certain admissions made to a State's witness by the accused after the latter had been pursued, overtaken, his pistol taken from him, and himself put under the immediate guard of the witness, but before he was expressly informed that he was arrested, so far as this witness knew. A witness for the defence, however, testified that the accused had been expressly arrested before the admissions were made to the State's witness. The other evidence against the accused was purely circumstantial. The court below instructed the jury to disregard the admissions if they believed the State's witness; and if not, to consider them. *Held,* that the court erred in allowing the admission to go to the jury at all, on the predicate laid by the State's witness; that it erred in submitting the competency of the evidence to the determination of the jury; and that it erred in leaving the admission before the jury, and attempting to control its effect by instructions, instead of wholly withdrawing it from their consideration.

3. ARRAIGNMENT. — In this State an arraignment is necessary only in a trial for a capital offence, and, if such a trial results in a capital conviction, the record on appeal must show that the accused was arraigned. But if, on a trial for murder, the accused was convicted of murder in the second degree, the record on appeal need not show an arraignment, inasmuch as the conviction is not for a capital offence.

4. CHARGE OF THE COURT. — In a trial for murder, the court below charged the jury on both degrees of that offence, and also on the requisite cogency of circumstantial evidence relied on for a conviction, but so conglomerated this latter instruction with the charge on murder in the first degree that the jury may have construed it as applicable to that degree alone, and not to the second degree, of which they convicted the accused. *Held,* that a charge defective in this respect may have been prejudicial to the rights of the accused.

APPEAL from the District Court of Medina. Tried below before the Hon. T. M. PASCHAL.

The appeal in this case is from a conviction for murder in the second degree, had upon an indictment which charged the appellant with the murder of one Sandy Winn, on April 6, 1879. A term of twenty years in the penitentiary was the punishment assessed and adjudged against the appellant.

On the 6th, 7th, or 8th of April, 1879, the dead body of a man was found on a rocky hill in the county of Medina. The skull had been crushed and the head and face beaten and bruised, as though by some heavy instrument. The ground plainly indicated that the body had been dragged to the place at which it was found, and the trail left by it led back to where, at a distance of three or four hundred yards, a " camp " had been recently made with a wagon and some twelve or fifteen horses and mules. At the camp was a pool of blood, somewhat concealed by dirt and trash which had been put upon it, and blood appeared along the trail from the camp to the body. It was apparent on the ground that the body had been dragged, feet foremost, by two horses, of which one was shod and the other not shod, and which by a circuitous route returned from the body to the camp. The trail made by the wagon which had stopped at the camp showed that the wheels would not " track," on account of the left rear wheel overlapping the left front wheel by an inch or so. The wagon, as shown by its trail, had come from the west, and from the direction of the house of one Sam Johnson, and after it left, took an eastwardly course. Benjamin White, the State's witness from whose testimony these details are derived, and who appears to have found the body, did not know whose corpse it was. He immediately notified his neighbors, and an inquest was held and the body identified as that of Sandy Winn.

Sam Johnson, for the State, testified that the defendant, Nolen, accompanied by Sandy Winn and Ed Swift, passed witness's house on the way west with a herd of cattle, some

five or six months previous to the murder of Winn. A
week or two prior to that event, Nolen came to witness and
said he was indebted to Sandy Winn, and requested wit-
ness to let him have forty, fifty, or sixty dollars, offering a
horse for the money. Witness told Nolen he did not have
the money, and at his request went and told Sandy Winn that
he (witness) would try and get the money for him. Sandy
said that Nolen owed him for eight months' work, at $20 per
month. Neither Nolen nor Sandy expressed any ill-feeling
towards the other. The morning before the body was
found, Nolen and Swift, with their wagon and some loose
horses and mules, came from a western direction by wit-
ness's place, and inquired for directions to Jeff Johnson's,
on Squirrel Creek. Sandy was not along with them, but
was out hunting his horse, as Nolen told witness. Witness
directed William Dancer, a man in his employ, to accom-
pany Nolen and Swift a mile or so in the course they de-
sired to go, and then to drive home a certain yoke of oxen
and pair of horses. Before the party started, witness left
home and was absent several hours. Dancer did not return
until about four o'clock in the afternoon, and then said he
had had some difficulty in finding the oxen and horses.
He remained with witness one, two, or three days longer,
and went away on a small gray pony, saying he was going
to McGaughey's, in Kerr County. He had no arms while
he stayed with witness, and none when he went away.
Witness afterwards heard McGaughey say that Dancer did
come to his house. Sandy Winn, when witness saw him,
had a black-handled six-shooter, and rode a small dark-blue
roan pony, shod all around. To the admission of the state-
ments made to this witness by Sandy Winn and Mc-
Gaughey, the defence reserved the second and third bills of
exception referred to in the opinion.

Henry Shane, for the State, testified that he had seen
Sandy Winn, the deceased, in his lifetime, and saw and
recognized his corpse on April 8, 1879. Witness concurred

in the testimony of White as to the place where the body
was found, its condition, description of the wagon and of
the camp, etc.   After the coroner's inquest, the witness, at
the instance of citizens and the special request of the cor-
oner, followed the trail of the wagon, and overtook it April
12th, near the corner of Wilson and Atascosa Counties.   It
was in charge of Ed Swift, and was camped about two
hundred yards from the house of Capt. Tom, who lives
about seventy miles from the scene of the murder.   In its
route it had taken circuitous courses, sometimes on roads
and sometimes on no road.   Witness learned that the party
with it had penned their animals in Jeff Johnson's pen,
which was about fifteen miles from the camp near which
the body of Winn was found.   On reaching the wagon at
its camp near Tom's, the witness and his two companions
learned from Swift that Nolen would that night be at John
Camp's house, which was distant some twenty or twenty-
five miles.   The pursuing party consisted of the witness,
with one Tomlinson, and a State ranger named Carothers,
who took the charge of the pursuit.   Proceeding to John
Camp's, they reached there between daylight and sunrise,
and saw Nolen on the gallery, dressed and putting on his
boots.   When accosted by the party, he seemed calm and
unexcited.   Carothers and Tomlinson went to him, and
witness passed to the rear of the house.   When witness
came round to the front again, he told Nolen that the party
had lost some mares, and wished to examine his stock.
Nolen told the party where his stock were, and readily con-
sented to go with them.   Whether Nolen was arrested at
Camp's the witness did not know, but his saddle-bags were
examined and his pistol was taken by Carothers.   On their
way back to where the wagon and stock were encamped,
near Tom's, the witness and Nolen rode together and en-
gaged in a conversation, in the course of which the witness
asked Nolen if Sandy Winn had joined them at the camp
where the killing was done, and Nolen replied that he had.

Witness asked Nolen if he had camped at that place, and Nolen at first denied that he had, and then told witness to ask William Dancer, who knew more about it than he (Nolen) did. Witness spoke to Nolen about the murder of Sandy Winn, and he replied, "That is all right; that matter will be fully investigated at Uvalde." Up to this time the witness did not regard Nolen as being under arrest, but he and his party kept their eyes on him, and would not have allowed him to escape if he had shown any desire to do so. When they got within a mile and a half of the camp near Capt. Tom's, Carothers asked Nolen if he knew what they wanted with him. Nolen replied, "No," and then Carothers arrested him for the murder of Sandy Winn. On their way back to Medina County, the party took Nolen by the scene of the murder, and he manifested emotion and wept. Swift told witness that they (Nolen and Swift) had been in the camp near Tom's for three days; and when witness mentioned this statement of Swift to Nolen, during the conversation on their way from Camp's, he did not deny it. Nolen did not consider himself in arrest. The defence reserved exceptions to the conversation detailed by this witness.

R. Richter, for the State, testified that he lived not far off the route from Sam Johnson's to McGaughey's, in Kerr County, and that on the 7th or 8th of April, 1879, William Dancer came to his house and proposed to trade horses, on account of his horse being broken down. Witness traded with him, and got a small blackish roan mare pony, shod all around and footsore. Dancer also proposed to trade to witness a nickel-plated six-shooter pistol; but witness did not trade for it, and had forgotten what kind of a handle it had. Dancer said that he had got the pony from his partner. He stayed at witness's about two hours, and then left, saying that he was going to McGaughey's, but would soon return from there. Witness has never seen him since. This was the evidence adduced by the State.

W. Tomlinson, who was one of the captors of Nolen, testifying for the defence, stated that when he and Carothers approached Nolen on the gallery of Camp's house, Carothers told Nolen that he wanted him, or was after him, about some stolen horses; and he arrested Nolen then and there, and searched his saddle-bags and took from them a black-handled six-shooter pistol.

The defendant put his character in issue by the testimony of several citizens of Lavaca County, where he lived. They had known him for twenty years, and some of them for longer periods, and concurred in attributing to him a high and irreproachable character as a peaceable, honorable, fair, and law-abiding man.

*A. P. Bagby*, for the appellant.

*Thomas Ball*, Assistant Attorney-General, and *W. B. Dunham*, for the State.

WINKLER, J. The appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the State penitentiary for a period of twenty years, on an indictment which charges him with the murder of one Sandy Winn, in Medina County, on April 6, 1879. From our views of the case as presented by the record, it will not be necessary to follow counsel in the argument, or consider consecutively the several supposed errors assigned.

As to the question raised by the defendant's first bill of exceptions, to the effect that the prosecuting attorney was permitted to interrogate one of the State's witnesses, over objection by defendant's counsel, by a certain question as to what the witness had said on a former examination: the question as stated in the bill of exceptions is, "Did not you say on a former examination that Nolen said that he wanted to pay off that damned old fellow, to get rid of him? — referring to the deceased." In law, as to the manner in which a witness is to be examined, "the subject lies chiefly in the

discretion of the judge before whom the case is tried, it being from its very nature susceptible of but few positive and stringent rules. The great object is to elicit the truth from the witness; but the character, intelligence, moral courage, bias, memory, and other circumstances of witnesses are so various as to require almost equal variety in the manner of interrogation; and the degree of intensity, to attain that end." 1 Greenl. on Ev., sect. 431.

In the direct examination of a witness, the general rule is that it is not allowable to put to him what are termed *leading questions*, — that is, questions which suggest to the witness the desired answer. Id., sect. 434, and note 5. This rule, however, has no reference to that portion of the testimony which is merely introductory to that which is material. The rule which requires the avoidance of leading questions was, we are of opinion, violated by allowing the question to be put to the witness in the form as set out. There are, it is true, exceptions to this rule, but this does not appear to be within those exceptions. Id., sect. 435, and notes. It is a general rule of evidence that a party will not be allowed to impeach his own witness. This rule has, however, been so modified by statute, in criminal trials, as "that any party, when facts stated by the witness are injurious to his cause, may attack his testimony in any other manner except by proving the bad character of the witness." Code Cr. Proc., art. 755. It does not appear that the objectionable question was asked for the purpose of contradicting, discrediting, or impeaching the credibility of the witness, but rather to get before the jury in an indirect way evidence adduced on another trial.

Ordinarily, we would not reverse a judgment on account of a want of observance of the strict rules of evidence, for the reason that the subject is so largely confided to the trial judges; but a case might arise where this discretion had been so far abused as to require our interposition in order to protect a party from injury. We may be indulged in the

suggestion, inasmuch as the rules of evidence known to the common law of England, both in civil and criminal cases, shall govern in the trial of criminal actions in this State, except when they are in conflict with the provisions of the Code of Criminal Procedure, or some statute of the State (Code Cr. Proc., art. 725), that it is of the first importance that the common-law rules of evidence be carefully studied and observed by judges, prosecuting attorneys, and all others whose business it is to take part in criminal prosecutions in this State.

The matter set out in the defendant's fifth bill of exceptions is one of graver importance than any other ruling on the evidence. This matter may be succinctly stated as follows: The State's witness Henry Shane testified that after the coroner's inquest, held one day after the finding of the body, the witness, at the request of citizens, and especially at the request of the coroner, having got on track of a wagon at the place where the dead body was found, followed the track to Rabbit Hill, near the corner of Wilson and Atascosa Counties, a distance of about seventy miles, by circuitous routes, sometimes in different roads and sometimes without a road, and having there found a wagon and one Swift, from whom the pursuing party learned that the defendant had gone to one John Camp's, a distance of twenty or twenty-five miles (other witnesses making the distance less), followed on, and between daylight and sunrise the next morning came upon the defendant, at Camp's house, up, dressed, and putting on his boots. The party in pursuit of the defendant at this point consisted of the witness Shane, one Tomlinson, and one Carothers, a member of the State rangers, who had joined the witness in the pursuit, and had taken charge of the party.

Inasmuch as what follows appears to have been elicited by the question mentioned in the bill of exceptions, and which the court permitted to be answered, over objection by the defendant's counsel, we here set it out in the exact

Opinion of the court.

language of the witness as found in the statement of facts, as follows: "I went to the back of the house, and Carothers and Tomlinson went to Nolen. When I came around to where Nolen was, I told him we had lost some mares and wanted to examine his stock. He told us where they were, and readily consented to go with us. I did not go into the house at first with Carothers and Tomlinson, but went to the back of the house. I do not know that Carothers put Nolen in custody at John Camp's. Carothers examined his saddle-bags and took his pistol. On the way back to where the wagon and stock were, Carothers and the rest of the party rode in front, and I in rear with Nolen, with whom I had a long conversation. I asked him if Sandy had joined them at the camp at which the killing was done, and he said he had. I asked him if he had camped at that place, which he at first denied, but then said to ask William Dancer, who knew more about it than he did. I spoke to him about the murder of Sandy, and he said, "That is all right; that matter will be fully investigated at Uvalde." Up to this time I did not regard Nolen as being under arrest; but we kept our eyes on him and guarded him, and would not have allowed him to escape had he shown any desire to do so. When we reached within about one and a half miles of the place where Nolen's wagon and stock were (at Capt. Tom's), Carothers asked Nolen if he knew what they wanted with him. He replied, 'No,' and Carothers then arrested him for the murder of Sandy."

The question objected to was this: "Please state what P. S. Nolen said to you about Sandy Winn, the deceased, after you left Camp's house and before he was placed under arrest?" In giving the bill of exceptions the judge says, by way of explanation for his ruling, that "before this testimony as to the admissions or confessions of defendant was permitted, the witness was examined as to whether defendant was in his custody, or that of any of witness's party. He replied that he was not under arrest or in custody; but,

on further questioning, said that he would not have permitted defendant to escape had he tried to, but defendant was not told so.   This was deemed sufficient to admit the testimony, and when subsequent testimony disclosed the fact that he had been arrested by another member of the party, the court withdrew in its charge these admissions from the jury, provided they believed the witness Tomlinson's statements as to defendant's being under arrest at the time."   Tomlinson's testimony on the subject was as follows : "I went on the morning of April 12th, 1879, with Carothers and Shane to the house of John Camp, in search of P. S. Nolen.   We got there just after daylight, and found Nolen just up, and sitting on the gallery putting on his boots.   Carothers and I went up on the gallery, and Shane went to the rear of the house.   Carothers told Nolen that he wanted him, or was after him, about some stolen horses, and arrested him then and there.   He searched his saddle-bags and took therefrom a pistol,—a six-shooter, black-handled.   We took Nolen back to the wagon and stock, under arrest.   We rode back sometimes by twos, and sometimes all abreast."

The charge of the court on this particular subject embraces the tenth and eleventh paragraphs, and is as follows : " 10. If the jury find from the testimony that, at the time the defendant made the confessions testified to by the witness Shane, he was in the custody of said Shane, or in the custody of any other person in company with Shane, then such confessions cannot be considered by you, and you are instructed to discard them from your consideration.   It matters not whether the persons were authorized to make the arrest, or whether the law is complied with ; the question is, simply, was he in custody,—that is, involuntarily restrained of his liberty.   11. If he was not in such custody, then you may consider the confessions testified to ; you being the judges as to what weight you will attach to it, or to any portion of it."

We are clearly of opinion that, agreeably to the testimony, the defendant was in restraint and deprived of his liberty from the time the man Carothers, a member of the State rangers, and the witness Tomlinson stepped on to the gallery at the house of John Camp, where the defendant was, and the witness Shane passed to the rear of the house, and Carothers deprived him of his six-shooter; and that the court erred, to the prejudice of defendant, in not excluding the testimony of the witness Shane entirely, as to all the confessions made to him by the defendant from and after the time Carothers deprived him of his pistol, whether there was any formal announcement made that he was arrested or not, he being surrounded, disarmed, and informed he was wanted; and this, too, by a party headed by a member of the State rangers. Under the circumstances, he was not required to inquire into the authority of the person by whom he was captured. If an officer had been sent with a warrant of arrest, and the question had been raised as to what would constitute arrest, then, agreeably to the Code of Criminal Procedure, art. 253, he would be arrested when he had been actually placed under restraint or taken into custody by the officer or person executing the warrant of arrest. The same rule, we think, should apply here, in the absence of one more definite.

The court erred, secondly, in submitting to the jury the question as to whether the defendant was under restraint. Whether the testimony was admissible or not was a question of law for the court, and not for the jury; and in a doubtful case the defendant should have had the benefit of the doubt. But in the present case there was no doubt remaining on the mind of the court; but instead of withdrawing the testimony as to the confessions from the jury entirely, he submitted the question to the jury. And, in the third place, the court erred greatly to the prejudice of the defendant when, instead of promptly withdrawing it from the jury, when first satisfied of its inadmissibility, he permitted it to

stand until apparently the testimony had all been admitted, relying on the doubtful expedient of controlling it by the charge. *Myers* v. *The State*, 6 Texas Ct. App. 1.

Doubtless a case might arise where a similar error might not materially affect the rights of the defendant, as in *Speer's Case*, 4 Texas Ct. App. 474; but in one like the present, where the question of guilt depends solely upon circumstantial evidence, the liability to injury is manifest.

The fact that it is not shown that the defendant was arraigned is in this case no longer of moment; he having been by the verdict of the jury in the case virtually acquitted of murder in the first degree, he cannot hereafter be convicted of an offence where an arraignment is required. Whatever may be the requirements of the common law, or the practice in other States, with us there is no arraignment of a defendant except upon an indictment for a capital offence. Code Cr. Proc., art. 508. In capital felonies, however, except in a case like the present, where the defendant is to be tried a second time after an acquittal of the capital felony, an arraignment is requisite, and that this has been done should appear from the record when before this court on appeal. Code Cr. Proc., art. 508, and following.

The evidence admitted over objection of the defendant, and set out in bills of exception Nos. 2 and 3, was but hearsay, so far as is discernible from the record before us, and ought to have been excluded.

We deem it proper to notice one objectionable feature in the charge. The charge is divided into two parts: one portion relating to murder in the first degree, and the other to murder in the second degree. The charge of the court on circumstantial evidence is so intimately interwoven with that portion of the charge on murder in the first degree, the jury might reasonably have supposed that the charge on that subject applied alone to that degree of the offence, and that it had no reference to murder in the second degree;

there being nothing in the charge by which the jury was informed that it applied as well to the one as to the other. In every case of felony where a conviction is dependent alone on circumstantial evidence, the judge should, by an appropriate instruction, inform the jury as to the weight and conclusiveness of that character of evidence in order to warrant a conviction upon it alone. *Hunt* v. *The State,* 7 Texas Ct. App. 212, and authorities there cited. In a murder case of this character this rule is imperative.

For the errors pointed out, we are of opinion the court should have awarded the defendant a new trial. The judgment must be reversed and the cause remanded.

*Reversed and remanded.*